IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


**JENNIFER NICHOLAS,**                                3:11-CV-00792 RE

Plaintiff,                                **OPINION AND ORDER**

v.

**MICHAEL J. ASTRUE,**
Commissioner of Social Security,

Defendant.


**REDDEN**, Judge:

Plaintiff Jennifer Nicholas ("Nicholas") brings this action to obtain judicial review of a

final decision of the Commissioner of the Social Security Administration ("Commissioner")

denying her claim for Disability Insurance Benefits and Supplemental Security Income benefits.

For the reasons set forth below, the decision of the Commissioner is reversed and this matter is

remanded for further proceedings.


1 - OPINION AND ORDER

## BACKGROUND

Born in 1981, Nicholas completed a general equivalency degree, and has no past relevant work. In March 2006, Nicholas filed an application for social security income and disability insurance benefits, alleging disability since June 4, 1999. Tr. 63, 66. Her application was denied initially and upon reconsideration. After a February 2010 hearing, an Administrative Law Judge ("ALJ") found her not disabled. Nicholas's request for review was denied, making the ALJ's decision the final decision of the Commissioner.

## ALJ's DECISION

The ALJ found Nicholas had the medically determinable severe impairments of degenerative disc disease, pelvic pain, an affective disorder, and narcotic abuse. Tr. 21.

The ALJ found that Nicholas's impairments did not meet or equal the requirements of a listed impairment. Tr. 22.

The ALJ determined that Nicholas retained the residual functional capacity to perform a limited range of light work. *Id.*

The ALJ found that Nicholas was not disabled and retained the ability to work as a small products assembler or paper sorter/recycler. Tr. 28.

The medical records accurately set out Nicholas's medical history as it relates to her claim for benefits. The court has carefully reviewed the extensive medical record, and the parties are familiar with it. Accordingly, the details of those medical records will be set out below only as they are relevant to the issues before the court.

## DISCUSSION

2 - OPINION AND ORDER

Nicholas contends that the ALJ erred by: (1) failing to find additional severe impairments at step two; (2) finding her not fully credible; (3) improperly weighing medical evidence; (4) failing to find that her impairments met or equaled in severity a Listed impairment; and (5) failing to credit lay testimony.

## I. Step Two

At step two, the ALJ determines whether the claimant has a medically severe impairment or combination of impairments. *Bowen v. Yuckert,* 482 US 137, 140-41 (1987). The Social Security Regulations and Rulings, as well as case law applying them, discuss the step two severity determination in terms of what is "not severe." According to the regulations, "an impairment is not severe if it does not significantly limit [the claimant's] physical ability to do basic work activities." 20 CFR § 404.1521(a). Basic work activities are "abilities and aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling." 20 CFR §§ 404.1521(b); 416.920(c).

The step two inquiry is a *de minimis* screening device to dispose of groundless claims. *Yuckert,* 482 US at 153-54. An impairment or combination of impairments can be found "not severe" only if the evidence establishes a slight abnormality that has "no more than a minimal effect on an individual's ability to work." *See* SSR 85-28; *Yuckert v. Bowen,* 841 F2d 303, 306 (9th Cir 1988) (adopting SSR 85-28). A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, and cannot be established on the basis of a claimant's symptoms alone. 20 CFR § 404.1508.

The ALJ properly determined that Nicholas had severe impairments at step two and continued the analysis. Any error in failing to identify other limitations as "severe" at step two is therefore harmless. *Lewis v. Apfel*, 236 F.3d 505, 511 (9th Cir. 2001).

## II. Credibility

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir 1995). However, the ALJ's findings must be supported by specific, cogent reasons. *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir 1998). Unless there is affirmative evidence showing that the claimant is malingering, the Commissioner's reason for rejecting the claimant's testimony must be "clear and convincing." *Id.* The ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints. *Id.* The evidence upon which the ALJ relies must be substantial. *Reddick*, 157 F.3d at 724. *See also Holohan v. Massinari*, 246 F.3d 1195, 1208 (9th Cir 2001). General findings (e.g., "record in general" indicates improvement) are an insufficient basis to support an adverse credibility determination. *Reddick* at 722. *See also Holohan*, 246 F.3d at 1208. The ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony. *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir 2002).

In deciding whether to accept a claimant's subjective symptom testimony, "an ALJ must perform two stages of analysis: the *Cotton* analysis and an analysis of the credibility of the claimant's testimony regarding the severity of her symptoms." [Footnote omitted.] *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir 1996).

/ / /

Under the *Cotton* test, a claimant who alleges disability based on subjective symptoms "must produce objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged...." *Bunnell*, 947 F.2d at 344 (quoting 42 U.S.C. § 423 (d)(5)(A) (1988)); *Cotton*, 799 F.2d at 1407-08. The *Cotton* test imposes only two requirements on the claimant: (l) she must produce objective medical evidence of an impairment or impairments; and (2) she must show that the impairment or combination of impairments *could reasonably be expected to* (not that it did in fact) produce some degree of symptom.

*Id.* at 1282.

The ALJ found that Nicholas's allegations as to the intensity, persistence and limiting effects of her symptoms were not credible to the extent that they are inconsistent with the RFC assessment. Tr. 41. Nicholas testified that she has anxiety and "panic attacks and I can't breathe." Tr. 1614. She testified that she shakes, gets angry, cries and has to leave. *Id.* When she gets anxious "it takes over everything else, anything I was thinking about, I can't think about anything else." Tr. 1615. Nicholas testified that she stays home 95% of the time because she does not like being around people. She goes to the grocery store when she thinks there will be fewer people there. Nicholas testified that she has back pain for which she takes Hydrocodone, and that her pain is so severe that seven to ten days a month she lies on the couch most of the day while her mother takes care of the children. Tr. 1619. She estimated that she can walk one to two blocks, can stand 30-45 minutes, and can sit 30 minutes before needing to change position. Tr. 1622. She testified that Clonazepam makes her groggy, loopy, and tired. Tr. 1626.

The ALJ appropriately cited extensive medical evidence indicating that Nicholas sought narcotics dramatically in excess of what her treating physician prescribed, and that multiple examining and treating physicians noted drug seeking behavior. Tr. 24-25, 406,

5 - OPINION AND ORDER

. 478, 592, 507, 513, 266, 536, 541, 544, 551, 558, 671, 570, 574, 650, 998, 1069, 1231, 1364, 1236, 1240, 1241, 1246, 1250, 1253, 1255, 1373, 1380, 1258, 1386, 1391, 1178, 1183, 1267, 1273, 1279, 1402, 1288, 1290, 1294, 1305, 1406, 1308, 1312, 1434, 1314, 1209, 1416, 1344, 1421, 1347, 1353, 1359, 1428, 1099, 1525, 1531, 1533, 1558, 1570, 1571, 1581. Several physicians noted that the plaintiff's reports of disabling back pain were completely inconsistent with her behavior. 1209, 1347.

The ALJ noted that Nicholas repeatedly reported to her medical providers that her prescriptions had been stolen, lost, or discarded by others. Tr. 25, 314, 308, 306, 305, 302, 296, 293, 284, 904, 893, 544, 277, 792, 845, 1467, 1556. An ALJ may properly conclude that a claimant is not fully credible based on drug seeking behavior. *Edlund v. Massanari*, 253 F.3d 1151, 1157-58 (9th Cir. 2001).

Nicholas argues that, in addition to her drug seeking behavior, she had explosive, inappropriate behavior that her physicians and nurse practitioners would not tolerate. Several care givers refused to treat her because of verbal abuse and fear of her. Tr. 291, 292, 289, 276, 671, 680, 1195, 1196. Jackelyn Gail, Nicholas's mother, testified that her daughter was never able to get along with other children in school and was expelled from school at age 12 because she was unable to behave appropriately and threatened other children.

The evidence that Nicholas has mental health issues does not make her more credible. The ALJ cited clear and convincing reasons to reject her subjective complaints.

### III. The Medical Evidence

Disability opinions are reserved for the Commissioner. 20 C.F.R. §§ 404.1527(e)(1); 416.927(e)(1). If no conflict arises between medical source opinions, the ALJ generally must

accord greater weight to the opinion of a treating physician than that of an examining physician. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). In such circumstances the ALJ should also give greater weight to the opinion of an examining physician over that of a reviewing physician. *Id.* But, if two medical source opinions conflict, an ALJ need only give "specific and legitimate reasons" for discrediting one opinion in favor of another. *Id.* at 830. The ALJ may reject physician opinions that are "brief, conclusory, and inadequately supported by clinical findings." *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005).

### A. Amy M. Kobus, Ph.D.

Dr. Kobus completed a psychological consultation in March 2006. Dr. Kobus did a clinical interview, reviewed the medical record, and administered a series of tests. Tr. 325-34. Nicholas was taking Wellbutrin and Clonazepam for depression and anxiety. Nicholas tried to leave the interview and testing several times, and had to be talked into staying. Tr. 328. Due to her agitation and lack of cooperation the WMS-III and the WRAT-3 were not administered. Tr. 329. Dr. Kobus noted that the usual interview and testing procedure took four hours, but this one took six hours to complete.

Dr. Kobus found that Nicholas's overall intellectual ability was low average. Tr. 331. Tests of concentration and attention were inconsistent, and Dr. Kobus found her performance "does suggest some problems with attention and memory." Tr. 330. She scored in the moderate range for depression and anxiety. Dr. Kobus noted "some conscious exaggeration of her symptom picture," and diagnosed Post Traumatic Stress Disorder and Social Phobia. Dr. Kobus assessed a Global Assessment of Functioning Score of 44. Dr. Kobus stated that treatment of her "anxiety and depression symptoms will be key if she has any hopes of obtaining and sustaining

employment." Tr. 332. Dr. Kobus noted that Nicholas did errands once a month due to anxiety, and spent her days caring for her son, going to appointments, and cleaning house. Tr. 328. She recommended that Nicholas's care be managed by a psychiatrist.

Dr. Kobus opined that Nicholas would do best in situations requiring minimal multi-tasking. Evaluating her mental residual functional capacity, Dr. Kobus found that the plaintiff had marked limitations in the ability to carry out detailed instructions, to work in coordination with others, the ability to interact with the public, and to get along with coworkers. Dr. Kobus found that Nicholas had marked limitations in the ability to carry out detailed instructions. Tr. 336. Dr. Kobus found numerous moderate limitations. Evaluating the paragraph B critera of the mental listings, Dr. Kobus found moderate limitation in social functioning and mild limitation in concentration, persistence, and pace. Tr. 337-38.

The ALJ noted Dr. Kobus's opinion and gave it "little weight." Tr. 26. The ALJ found that the assessment of functional limitations was inconsistent with the "minimal findings on mental status examination." *Id.* The ALJ noted that Dr. Kobus's opinion appeared to be based on the claimant's report of symptoms, which were not credible. The ALJ stated that the opinion was inconsistent with Nicholas's activities as a single mother.

Finally, the ALJ noted that in April 2007 Nicholas was taking Xanax a couple of times a week for anxiety, but had no other psychiatric care and denied depression. Tr. 192. Nicholas reported that she was a good cook, cared for her son, went to the park, watched movies, read to her son, helped at his school, and went for walks. She had friends and was moving out of her parents's home. The majority of these activities are consistent with Dr. Kobus's findings that Nicholas isolates and avoids social contact.

The ALJ concluded that Nicholas has a mild impairment in short-term memory and concentration and is 90 percent as alert as a normal person. Tr. 22. The ALJ found no other functional limitations arising from Nicholas's mental condition.

The Commissioner argues that Dr. Kobus's assessment of work-related functional limitations is contradicted by the doctor's note that Nicholas's concentration was adequate, her social skills were appropriate, and her affect was anxious but stable. Tr. 26, 328. However, read in context, Dr. Kobus's assessment is not contradicted by her notes.

The Commissioner argues that the ALJ appropriately relied on the conflicting opinion of nonexamining medical expert Lawrence Duckler, M.D. Dr. Duckler testified that PTSD could be interpreted as a form of anxiety disorder. Tr. 1645. Dr. Duckler did not testify as to the functional limitations arising out of either diagnosis, so there is no actual conflict between Drs. Duckler and Kobus. Moreover, multiple providers and examiners have diagnosed PTSD, including Jeff Melnick, PA-C, (May 2005), Slater Tai, M.D., (November 2006, PTSD and bipolar mood disorder type II with a GAF of 50), Sheri Laird, M.D., (February 2010) and Danielle Blackwell, F.N.P. (October 2004). Tr. 310, 1037, 1520, 307.

The ALJ failed to identify specific and legitimate reasons to give little weight to Dr. Kobus's explicit opinion regarding functional limitations.

**B. Donna C. Wicher, Ph.D.**

Dr. Wicher conducted a comprehensive psychodiagnostic evaluation of Nicholas in August 2005. Tr. 259-63. She reviewed a limited number of medical records and conducted an interview. Nicholas reported taking Xanax and Clonazepam, and complained of impaired concentration, fatigue, stress, nervousness, compulsiveness regarding cleaning, nausea, panic

.attacks, sleep disturbance and feelings of guilt. Tr. 259. Nicholas asserted that she had panic

attacks about two times a week, with tachycardia, chest pain, shortness of breath, nausea and

vomiting. Her symptoms are relieved by medications in about 30 minutes.

Nicholas reported low back pain during menstrual cycles, more severe since her son was

born in July 2002. She had abdominal pain with nausea, vomiting, and diarrhea. Tr. 260.

Dr. Wicher diagnosed rule-out Pain Disorder Associated with Psychological Factors and a

General Medical Condition, and Panic Disorder without Agoraphobia. Tr. 262.

> She neither demonstrated nor described any significant deficits in social
> functioning at the present time, although she did have difficulty getting
> along with others in the past. She complained of problems with concen-
> tration, but no clear concentration deficits were evident during the present
> evaluation.

Tr. 263. Dr. Wicher concluded that Nicholas's deficit in concentration, persistence, and pace

would be mild at most. *Id.* However, Dr. Wicher stated that, to the extent that Nicholas's

physical complaints are psychologically based, those complaints could affect her perceived

ability to sustain full-time employment.

The ALJ gave Dr. Wicher's opinion "significant weight," but found that the claims of

panic attacks were not fully credible in light of the medical evidence. The ALJ found that there

was medical evidence of anxiety, but only Nicholas's incredible assertions regarding panic

attacks. The ALJ properly weighed Dr. Wicher's opinion.

**C. Pat McChesney, P.M.H.N.P.**

Nurse McChesney conducted a psychiatric evaluation on 14 year old Nicholas in

November 1995. McChesney noted that Nicholas had never done well in school, that she had

been diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") at age 6, and that

treatment for the ADHD had not improved her behavior issues. Tr. 238. Nicholas reported

difficulty concentrating and being easily distracted. She presented as uncooperative, belligerent,

and irritable, though this decreased over time. McChesney noted that Nicholas, "despite the low

or borderline IQ findings in the psych testing that was done at Emanuel, appears to be of average

intelligence." Tr. 239. McChesney stated that her "judgment has been severely impaired." *Id.*

McChesney diagnosed Poly Substance Dependence v. Abuse; ADHD, combined type, and

dysthymic disorder, and assessed a GAF of 32.

Nicholas argues that the ALJ erred by failing to find that she has a severe cognitive

impairment. However, the record she cites indicates that Nurse McChesney disagreed with the

results of a psychological test which is not in the record. Moreover, Nicholas's reliance on this

evidence is misplaced because it precedes her alleged onset date of June 1999. *Carmickle v.

Comm'r of the Soc. Sec. Admin.,* 533 F.3d 1155, 1165 (9th Cir. 2008). Nicholas argues that the

date of the evidence does not matter because a severe cognitive impairment would not improve

with time. This is a good argument, but Nicholas seeks to rely on a missing document, by citing

a Nurse who is disagreeing with that document. Moreover, nurse practitioners are "other

sources," and cannot establish the existence of a medically determinable impairment. Social

Security Ruling 06-03P, 2006 WL 2329939, *2.

Nicholas points to Dr. Kobus's testing, indicating borderline scores in overall intellectual

functioning. Tr. 330. Dr. Kobus noted that there was a ten point difference between Nicholas's

Verbal IQ and Performance IQ scores, "suggesting that her Full Scale score may slightly

underestimate her intelligence." Tr. 330. Dr. Kobus concluded that overall intellectual ability

"is likely Low Average...." Tr. 331. Dr. Kobus did not diagnose a cognitive disorder. Nicholas

offers no evidence that a low average intelligence is a severe cognitive deficit. The ALJ's findings on this point are affirmed.

### D. Slater Tai, M.D.

Dr. Tai evaluated Nicholas in November 2006. Tr. 1037-38. Nicholas had been recently hospitalized against her will after threatening suicide when her prescription was not refilled. Tr. 994. Dr. Tai diagnosed Bipolar Disorder Type II and PTSD. Nicholas appeared anxious, and reported that Depakote helped her mood. Her main complaint was anxiety at night. Dr. Tai assessed a GAF of 50. In January 2007 Dr. Tai reduced her GAF score to 48.

The ALJ must address significant and probative evidence. *Vincent v. Heckler,* 739 F.2d 1393, 1394-95 (9th Cir. 1994).

The ALJ did not mention Dr. Tai. Accordingly, the ALJ erred.

### E. Other Treating Physicians

Nicholas points to several other treating physicians that the ALJ did not address. However, she does not cite any opinions from those medical providers in which the provider identifies a work-related limitation.

### F. Insomnia

Nicholas contends that the ALJ improperly rejected evidence of insomnia. The ALJ found that "[d]ue to use of pain medications and sleep disturbance [Nicholas] is only 90 percent as alert as a normal person." Tr. 27.

Nicholas argues that her insomnia, fatigue, and medication side effects combine to limit her more than the ALJ assessed. The only evidence that supports this assertion is Nicholas's testimony that she has 7-10 bad days a month, and the ALJ properly found her not fully credible.

Tr. 1619.  Her mother stated that "on bad days...she stays in bed."  Tr. 104.  Her step-father wrote

that Nicholas "does not sleep well at night as a result she is fatigued during the day and sleeps

during the day."  Tr. 64.  The ALJ did not err in assessing limitations arising from insomnia.

### G.  Chronic Interstitial Cystitis

The ALJ found that Nicholas had a severe impairment of pelvic pain.  Tr. 21.  Nicholas

does not identify what functional limitations arise from the diagnoses of cystitis, endometriosis,

or dysmenorrhea.  The ALJ gave "some credence to the claimant's pain complaints, she is

limited to light exertion work with positional changes."  Tr. 27.  The ALJ did not err in assessing

Nicholas's pelvic pain.

### H.  Hip and Knee Pain

In July 2006 Nicholas complained of bilateral hip pain of two months duration.  It hurt to

lie on either side, and the pain eased during the day.  She reported bilateral knee pain of about

two months duration, a dull ache and morning stiffness that eased as the day went on.  Tr. 651.

Kenneth P. Melvin, M.D., diagnosed bilateral trochanter bursitis and sub patellar bursitis.  *Id.*

Nicholas cites a March 2010 chart note by Sarah Koienga, M.D., recording a phone call

in which Nicholas reported that an ER doctor found tissue damage in her hips and knees.  Tr.

1534.  Dr. Koienga noted "[c]ompletely normal knee and hip x-rays."  *Id.*  Nicholas cites a

second record of a phone call she made to Shari Laird, M.D.,  reporting that the ER doctor found

soft tissue damage in the knees and hips.  Tr. 1542.  Dr. Laird made a note to obtain the ER

records.

The Commissioner points to an April 2005 xray in which the radiologist finds no

evidence of hip damage.  Tr. 343.

The ALJ did not err in evaluating the claimant's complaints of knee and hip pain.

## IV.  The Listings

The ALJ must determine whether a claimant's impairment meets or equals an impairment listed in "The Listing of Impairments" ("The Listings"). *See* 20 C.F.R. Part 404, Subpt. P, App. 1. The Listings describe specific impairments of each of the major body systems "which are considered severe enough to prevent a person from doing any gainful activity." *See* 20 C.F.R. §§ 404.1525(a), 416.925(a). Most of these impairments are "permanent or expected to result in death." *Id.* "For all others, the evidence must show that the impairment has lasted or is expected to last for a continuous period of at least 12 months." *Id.* If a claimant's impairment meets or equals a listed impairment, he or she will be found disabled at step three without further inquiry.

The Listings describe the "symptoms, signs, and laboratory findings" that make up the characteristics of each listed impairment. *See* 20 C.F.R. §§ 404.1525(c), 416.925(c). To meet a listed impairment, a claimant must establish that he or she meets each characteristic of a listed impairment relevant to his or her claim. *See* 20 C.F.R. §§ 404.1525, 416.925. To equal a listed impairment, a claimant must establish symptoms, signs, and laboratory findings "at least equal in severity and duration" to the characteristics of a relevant listed impairment, or, if a claimant's impairment is not listed, then to the listed impairment "most like" the claimant's impairment. *See* 20 C.F.R. §§ 404.1525(a), 416.926(a).

The ALJ considered Listings 12.04 (affective disorder), 12.06 (anxiety disorder), and 12.09 (substance addiction disorder). Nicholas contends that she meets paragraph B criteria for 12.04 and 12.06, citing the marked limitations in social functioning and maintaining concentration, persistence, and pace, citing Dr. Kobus. However, as noted above, Dr. Kobus's

opinion as to the paragraph B criteria and her opinion as to functional limitations are different. Dr. Kobus does not establish that Nicholas met or equaled in severity the criteria of the Listing.

Nicholas argues that she met the paragraph B criteria for repeated episodes of decompensation, citing notes about a hospitalization that occurred when she was 14. Tr. 235-37. As previously noted, medical opinions that predate the alleged onset of disability are of limited relevance in the Ninth Circuit. *Carmickle v. Comm'r of the Soc. Sec. Admin.,* 533 F.3d 1155, 1165 (9th Cir. 2008). Nicholas has not met her burden of demonstrating repeated episodes of decoompensation.

The ALJ did not err in determining that Nicholas's medical condition did not meet or equal in severity a Listed impairment.

## V. Lay Testimony

The ALJ has a duty to consider lay witness testimony. 20 C.F.R. § 404.1513(d); 404.1545(a)(3); 416.945(a)(3); 416.913(d); *Lewis v. Apfel,* 236 F.3d 503, 511 (9th Cir. 2001). Friends and family members in a position to observe the claimant's symptoms and daily activities are competent to testify regarding the claimant's condition. *Dodrill v. Shalala,* 12 F.3d 915, 918-19 (9th Cir. 1993). The ALJ may not reject such testimony without comment and must give reasons germane to the witness for rejecting her testimony. *Nguyen v. Chater,* 100 F.3d 1462, 1467 (9th Cir. 1996). However, inconsistency with the medical evidence may constitute a germane reason. *Lewis,* 236 F.3d at 512. The ALJ may also reject lay testimony predicated upon the testimony of a claimant properly found not credible. *Valentine v. Astrue,* 574 F.3d 685, 694 (9th Cir. 2009).

### A. Kelly Whickham, M.S.W.

Ms. Whickham was Nicholas's counselor from March 2005 through December 2007, and saw her once or twice a month. Tr. 1224. Ms. Whickham wrote that Nicholas was "often confused, agitated and would call numerous times asking for the same information over and over." *Id.* Ms. Whickham stated that in nine out of ten appointments Nicholas was agitated, irritated, and had trouble tracking the conversation. Nicholas was "often not rational." Tr. 1224. She did not interact with the receptionist well. Ms. Whickham said that Nicholas was unable to accept criticism or instruction appropriately, would often hang up the telephone on her in the middle of a conversation, walk out of her appointment before it was over, become upset, and a couple of times she refused to speak. Tr. 1225. She is unable to travel in unfamiliar places or use public transportation. Nicholas had trouble setting goals and was very dependent on her parents. Ms. Whickham opined that Nicholas would not be able to perform work-related duties at a consistent pace without an unreasonable number or length of rest periods arising from her mental health issues.

Ms. Whickham noted that Nicholas had attended a work assessment, and had "trouble keeping appropriate boundaries with her coworkers and maintaining her emotions." Tr. 1226. Nicholas is often irrational, forgetful, argumentative, agitated, and angry. At times she is listless, flat, paranoid and confused.. *Id.* Ms. Whickham stated that Nicholas is isolated and has trouble maintaining friendships due to boundary issues and erratic behavior. Ms. Whickham noted that Nicholas is emotionally exhausting to work with, and that she "is unable to work due to extreme mental health issues." *Id.* Finally, Ms. Whickham stated that she had only had a few clients with comparably serious mental health issues in eleven years as a caseworker.

The ALJ noted Ms. Whickham's report and gave it little weight. Tr. 26. The ALJ stated that Ms. Whickham is not an acceptable medical source, and that her descriptions were not consistent with the claimant's daily activities. Tr. 26.

However, Ms. Whickham does not offer a medical opinion, rather she describes behavior that may be relevant to Nicholas's ability to work. As to the claimant's daily activities, as previously noted, the majority of the evidence indicates isolating, angry, erratic behavior, and Ms. Whickham's descriptions are consistent with that evidence. The ALJ's improperly rejected Ms. Whickham's testimony. On remand, the ALJ must re-evaluate this evidence.

**B. Jackelyn and Philip Gale**

Ms. Gale is Nicholas's mother. In June 2006 she filled out a function report in which she states that on good days, Nicholas showers, has breakfast, cleans her room, and cares for her son. Tr. 103. On bad days, she stays in bed late, eats, watches television, "and is quite reclusive." *Id.* Ms. Gale and her husband spend a considerable amount of time caring for Nicholas's son. Ms. Gale stated that her daughter had always had "a hard time coping with people and situations." Tr. 104. She has trouble sleeping "on many occasions." *Id.* Ms. Gale stated that "normally" her daughter takes very good care of herself, but on bad days, she stays in bed. *Id.* She has to be reminded to take medications and of appointments. She prepares simple foods, does house cleaning and laundry, and sometimes needs a reminder to finish a chore. Tr. 105. She cannot pay bills, make change, or handle a checking account. Tr. 106.

Ms. Gale wrote that Nicholas watches television for six to eight hours a day, though she "doesn't usually finish watching any particular program." Tr. 107. She does not like groups larger than about eight persons, has trouble making and keeping friends, and does not like to go

to appointments alone. Tr. 107. She is impulsive, uncooperative, unable to compromise, easily

angered and distracted, and irrational. Tr. 108. Nicholas has extreme mood swings, and gets

angry when stressed. Tr. 109.

Philip Gale is Nicholas's step-father. He stated, in February 2010, that Nicholas is easily

confused and "lacks the ability to rationally figure out what needs to be done." Tr. 137. She has

"little ability" to understand written instructions. *Id.* Mr. Gale opined that Nicholas is unable to

concentrate, and that she has ADHD unimproved by medication. She has no concept of time,

and her decision making process is not good because she is irrational. Nicholas does not

maintain friendships and does not do well in crowds. Mr. Gale stated that Nicholas has "very

poor social behavior" and tends to "blow up easily over minor issues." Tr. 138. He reported that

she cannot accept criticism, and her reaction to criticism is to become hostile, combative, or

irrational. Mr. Gale stated that Nicholas is afraid of public transportation and is unable to

complete a plan. She cannot stay on task for any extended period of time, does not sleep well at

night and is fatigued during the day.

The ALJ found that the statements from Mr. and Mrs. Gale were not entirely credible in

light of the treatment record. Tr. 27. The ALJ said that although Nicholas had a history of

difficulty getting along with people, she was capable of demonstrating good social skills when

she wanted to, citing the psychological examinations by Drs. Wicher and Kobus.

The ALJ's determination as to Nicholas's social skills is supported by substantial

evidence. However, the ALJ did not address the other functional limitations identified by the lay

witnesses, particularly the evidence regarding concentration and persistence. On remand, the

ALJ needs to examine this issue.

18 - OPINION AND ORDER

## VI. Remand

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. *Harman v. Apfel,* 211 F.3d 172, 1178 (9th Cir. 2000), *cert. denied,* 531 U.S. 1038 (2000). The issue turns on the utility of further proceedings. A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is insufficient to support the Commissioner's decision. *Strauss v. Comm'r,* 635 F.3d 1135, 1138-39 (9th Cir. 2011)(quoting *Benecke v. Barnhart,* 379 F.3d 587, 593 (9th Cir. 2004)). The court may not award benefits punitively, and must conduct a "credit-as-true" analysis to determine if a claimant is disabled under the Act. *Id* at 1138.

Under the "credit-as-true" doctrine, evidence should be credited and an immediate award of benefits directed where: (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited. *Id.* The "credit-as-true" doctrine is not a mandatory rule in the Ninth Circuit, but leaves the court flexibility in determining whether to enter an award of benefits upon reversing the Commissioner's decision. *Connett v. Barnhart,* 340 F.3d 871, 876 (citing *Bunnell v. Sullivan,* 947 F.2d 871(9th Cir. 2003)(en banc)). The reviewing court should decline to credit testimony when "outstanding issues" remain. *Luna v. Astrue,* 623 F.3d 1032, 1035 (9th Cir. 2010).

Because it is not clear that Nicholas is disabled if the opinions of Drs. Kubos and Tai, and the lay witnesses, are credited as true, this matter must be remanded for further proceedings.

The ALJ needs to formulate a complete and accurate residual functional capacity analysis to present to the Vocational Expert.

The ALJ shall evaluate the opinions of Drs. Kubos and Tai, as well as the lay witnesses, on remand.

## CONCLUSION

For the above reasons, the Commissioner's decision is reversed and remanded for further proceedings under sentence four of 42 U.S.C. § 405(g) consistent with this opinion.

IT IS SO ORDERED.

Dated this __14__ day of September, 2012.

JAMES A. REDDEN
United States District Judge

20 - OPINION AND ORDER